**Robert W. CHASE, Appellant,**

v.

**PAUL HOLT DRILLING, INC., Appellee.**

**No. 46698.**

Court of Appeals of Oklahoma,
Division No. 2.

Feb. 19, 1975.

Rehearing Denied April 10, 1975.

Certiorari Denied June 24, 1975.

Released for Publication by Order of the
Court of Appeals June 26, 1975.

**218**

James R. Cox, Mitchell, Mitchell, De-Clerck, Cox & Halstead, Enid, for appellant.

Burton J. Johnson, Watts, Looney, Nichols, Johnson & Hayes, Oklahoma City, for appellee.

BRIGHTMIRE, Judge.

█ May an action founded on the breach of a rotary drilling contract be treated by the court instructionally as though it were a common law negligence action? While the parties do not precisely identify this issue as such, we think it is the decisive one, and we answer it in the negative.

Plaintiff, R. W. Chase, appeals from a judgment entered on a jury verdict denying him damages he claimed he sustained as a result of a "blowout" of a well being drilled by defendant, Paul Holt Drilling, Inc., in December 1971 pursuant to a written drilling contract executed November 25, 1971, and instead awarding the drilling company damages on its cross-petition. Appellant assails the judgment on two main grounds: (1) it is not supported by sufficient evidence; (2) it resulted from fundamentally incorrect instructions.

For their drilling agreement the parties used a standard form produced by the American Association of Oilwell Drilling Contractors (August 1964 revision).[1] It

---

1. Certain pertinent provisions are 10.1, 10.2, 10.3, 13.2 and 18.5:

"10.1 Contractor agrees to perform all work to be conducted by him under the terms of this contract with due diligence and care and in a good and workmanlike manner and shall provide a competent superintendent to supervise the work.

"10.2 Contractor shall maintain well control equipment in good condition at all times and shall use all reasonable means to control and prevent fires and blow-outs and to protect the hole.

"10.3 Subject to the terms hereof, at all times during the drilling of the well, Owner shall have the right to control the mud program, and the drilling fluid must be of a type and have characteristics acceptable to Owner and be maintained by Contractor in accordance with the specifications shown in Par. 2 of Exhibit 'A'. No change or modification of said specifications which materially increases the Contractor's hazards or costs of performing his obligations hereunder shall be made by Owner without consultation with and consent of the Contractor. Owner shall have the right to make any tests of the drilling fluid which may be necessary. Should no mud control program be specified by Owner in Exhibit 'A', Contractor shall have the right to determine the mud program and the type and character

provided for drilling three wells in Noble County, Oklahoma, to a depth of 2,150 feet for $2.30 a foot. Among the equipment the drilling company agreed to furnish was a 10-inch Shaffer Blowout Preventer series 900 single-manual.

Holt Drilling Company commenced drilling the hole the first day of December 1971. By 2:30 in the afternoon of December 2 the hole had reached a depth of about 1,342 feet. Suddenly the derrick man came down the "dead man line" and everybody could be seen running from the rig floor yelling "blowout."

Plaintiff's petroleum engineer, who happened to be at the well site when the blowout occurred, said he ran toward the base of the rig, looked at the blowout preventer and as he was about to order it closed he noticed it had no closing mechanism. Some crew member spoke up and said the closing apparatus was at the "bottom of [the] fire crack" and it would take a gin truck to move it. So the engineer ordered all engines shut down and he went into town to get the head of Holt Drilling Company—Paul Holt. Holt sent a pump truck out which pumped in 25 barrels of 13-pound mud "to no avail, it just blew it right back out."

Then a Halliburton truck with a larger pumping capacity was ordered out. It

of drilling fluid during the time that Contractor is performing work upon a footage basis under the terms of this contract.

.    .    .    .    .

"13.2 In the event of loss of circulation, partial loss of circulation, water flow, domal formation, abnormal pressures, heaving shale, or similar formation, salt or other similar condition, is encountered which makes drilling abnormally difficult or hazardous, causes sticking of drill pipe or casing, or other similar difficulty which precludes drilling ahead under reasonably normal procedures, Contractor shall, in all such cases, without undue delay, exert every reasonable effort to overcome such difficulty. When such condition is encountered, Owner shall assume risk of loss of or damage to the hole and to Contractor's equipment in the hole. Should such condition or conditions persist in spite of Contractor's efforts to overcome them, then after a period of twenty-four (24) hours time consumed in such efforts, further operations shall be conducted on a day work basis at the applicable day work rate until such conditions have been overcome and normal drilling operations can be resumed. The total time furnished by Contractor under the terms of this paragraph shall be limited to twenty-four (24) hours. The footage drilled while on day work basis shall be deducted from the footage charge.

.    .    .    .    .

"18.5 The Hole—Footage Basis: Subject to the provisions of Par. 13 hereof (relating to formations difficult or hazardous to drill and to loss of circulation) should a fire or blow-out occur or should the hole for any cause attributable to Contractor's operations be lost or damaged while Contractor is engaged in the performance of work hereunder on a footage basis, all such loss of or damage to the hole shall be borne by the Contractor; and if the hole is not in condition to be carried to the contract depth as herein provided, Contractor shall, if requested by Owner, commence a new hole without delay at Contractor's cost; and the drilling of the new hole shall be conducted under the terms and conditions of this contract in the same manner as though it were the first hole. In such case Contractor shall not be entitled to any payment or compensation for expenditures made or incurred by Contractor on or in connection with the abandoned hole, except for day work earned in coring, testing, and logging said well for which Contractor would have been compensated had such hole not been junked and abandoned.

"Notwithstanding the foregoing provisions, if the hole is lost or damaged without negligence on the part of the Contractor but as a result of the failure of Owner's casing or equipment either during or after the running and setting of such casing, or as a result of subsequent failure of the cementing job resulting in parted casing, such loss shall be borne by the Owner and Contractor shall nevertheless be paid: (a) For all footage drilled and other work performed by Contractor prior thereto; (b) For work performed in an effort to restore the hole to such condition as that further drilling or other operations may be conducted at the applicable day work rate; and (c) The cost of dismantling the rig and moving to and rigging up Contractor's equipment prior to starting the drilling of a new hole at a location designated by Owner if such be required. The work of drilling the new hole shall be performed by the Contractor under the terms and conditions of this contract."

pumped in about 50 barrels of 13-pound mud before the same thing happened—it blew right back up between four drill collars still in the hole.

At this point, with darkness setting in and use of lights hazardous, the driller decided to wait until the following morning and attempt to put the closing mechanism on the blowout preventer.

Plaintiff's petition was founded on a breach of duty arising from the contract. Specifically the pleading attached a copy of the drilling contract. Making especial reference to paragraphs 10.1 and 10.2 (see footnote 1) plaintiff charged defendant with a "violation of the terms of such agreement . . . [and] as a result of the violation by the Defendant of the terms of the agreement . . . the drilling hole has been lost . . ." at a redrill cost to plaintiff in the sum of $3,087. Then in the last paragraph plaintiff adds that "as a result of the negligent failure of Defendant to comply with the terms and provisions of the drilling contract . . . Plaintiff was required to expend . . ." an additional $35,000 in killing the well.

In its answer the drilling company set out a general denial, an admission of making the drilling contract mentioned by plaintiff, but insisted that it performed all of its requirements to the letter. The blowout, defendant alleged, "was due to circumstances beyond his [sic] control" in that "abnormal . . . pressure for such area" was unexpectedly encountered —pressure of such magnitude that "the equipment called for by the drilling contract . . . was unable to stop the flow" of the blowout. And for a final defense defendant asserted the misfortune "was an unavoidable casualty as to him, not brought about by any act of negligence or omission on his part."

Then defendant filed a "cross-petition" setting up a rather unusual allegational theory upon which to base a recovery against plaintiff for damages the drilling company says it suffered. First defendant acknowledged validity of the drilling contract and that the "blow-out preventer was entirely inoperative . . . [but] it should have been known to . . . [plaintiff when he agreed to a 10-inch 900 single-manual] that if abnormal pressure was encountered . . . [such] blow-out preventer would be inoperative" under the circumstances. Moreover, defendant continued, plaintiff "should have known" about the existence of the abnormal subsurface pressure, and therefore if someone's fault occasioned the blowout, it was plaintiff's "lack of precautions . . . in the requirements of equipment as well as in the weight of mud" in predictable anticipation of the abnormal pressure condition. Further, alleged defendant, while it was faultless, plaintiff was not and "as a result of the neglect [unspecified] of [plaintiff] and the violation of the contract . . . this Cross-Petitioner has suffered damages in the amount of $12,802.50 . . . [for] labor and materials . . . ."

A substantial amount of evidence was adduced in an effort by both parties to support only ex contractu theories following which the court gave a series of stock negligence instructions replete with such dandies as: "The mere proof of an accident or injury carries with it no presumption of negligence or contributory negligence, but the burden of proof rests upon the party alleging negligence . . ." etc., etc.

The instructions continued with a definition of "proximate cause" as used in connection with "any act of negligence." And then came this one:

"You are instructed that an unavoidable accident is a casualty which occurs without negligence of either party, and when all means which common prudence suggests have been used to prevent it. Neither party to an unavoidable accident is liable to the other for damages sustained, and the mere proof of that injury resulting therefrom raises no presumption of negligence.

"You are instructed that if you find by a preponderance of the evidence that the accident in this case was an unavoidable accident, then your verdict must be for the defendant."

Following this came an instruction defining common law "ordinary care" and "negligence."

Later on another instruction was given (No. 12) which told the jury it "should find for the plaintiff" if it found "defendant did not perform it's [sic] part of the contract to drill said Well in a good and workmanlike manner with due diligence . . . *and* use the reasonable or ordinary care required to prevent damage or injury to the Well, *and* was negligent in performing said contract *and* through *no fault of the plaintiff* . . . damages [were] occasioned . . . as submitted to you by the evidence of the plaintiff.

"On the other hand, if you do not so find and the damages sustained were caused by the plaintiff through his failure to perform his part of the contract and use the care required, you should find for the defendant.

"You are further instructed that if you find neither party failed to perform his part of the contract to drill the Well . . . *and* is not guilty of negligence in causing the damages . . . and [the] same was the result of an unavoidable casualty, you should . . . allow neither party to recover against the other.

"If, however, you find the Well blew out from an abnormal pressure, as defined in these instructions,[2] which made the drilling abnormally difficult or hazardous without the negligence of either party and said abnormal pressure was the proximate cause of the losses . . . then your verdict should be for the defendant on his cross-petition against the plaintiff." (emphasis ours)

Finally came Instruction No. 14, advising the jury that if their verdict was for plaintiff on his petition "then it must necessarily be against the defendant upon the Cross-Petition"; and by the same token if it found for defendant on its cross-petition it had to find for defendant on plaintiff's petition.

From the foregoing it becomes obvious that confusion overtook the case when an attempt was made to amalgamate two distinct legal theories of recovery—contract and tort—without discriminating regard for the pleadings or the evidence. This resulted in a hodgepodge of illegalities which undoubtedly were as incomprehensible to the jury as they are to us.

In an effort to untangle the instructional lines it is first necessary to analyze the pleadings to see just exactly what issues they raise.

[2] As we mentioned earlier plaintiff's petition speaks only to a failure of defendant to perform its contractual obligations. It does not contain any allegation relating to the breach of a common law duty by defendant. Reference in the last paragraph to a "negligent failure of Defendant to comply with the terms and provisions of the drilling contract" cannot be construed, as defendant suggests, as an attempt to plead the tort of common law negligence. In the context used the word "negligent" is really a superfluous adjective describing the reason for defendant's alleged failure to fulfill its contractual obligations. We say superfluous because if indeed defendant breached the contract, it is immaterial whether it did so negligently or otherwise.[3]

2. Instruction No. 11:
"The term 'abnormal pressure' as used in these instructions are those pressures not conforming to the rule of pressures ordinarily found in the particular area where the drilling was being performed or a pressure deviating from the type of pressure standard in that area."

3. No effort is made to invoke the equipment loss provisions which allocate losses to one or the other parties under certain conditions unless occasioned by other parties' *contractual* "negligence" or "gross negligence," as provided, for example, in paragraphs 18.1 through 18.4. Such negligence is to be distinguished from common law negligence.

In joining issues defendant answered with a general denial; an affirmation that it "complied strictly with the contract"; a statement that the blowout was "due to circumstances beyond [its] control," namely, an unforeseen subterranean pressure abnormal for the area requiring use of equipment not called for in the contract to control it; and that the blowout "was an unavoidable casualty . . . not brought about by any act of negligence" on its part.

At this point it can be seen the pleadings raise these contractual issues: Did loss of the well result from a breach of paragraphs 10.1 and 10.2 of the drilling contract? If so, was it excused by the "abnormal pressure" provisions of paragraph 13.2? Defendant's denial of negligence and assertion of "unavoidable casualty" not being connected to the contract amounted to no more than inoperative surplusage.

We turn now to the cross-petition defendant filed. It begins by affirming the drilling contract and though not well worded we infer defendant tried to allege in substance that the well was lost because (1) the blowout preventer specified by the contract was inadequate to stop the blowout, (2) the specification deficiency "should have been known to" plaintiff because he "should have made inquiries" about whether "any abnormal pressure might be encountered," and (3) such "lack of precautions" by plaintiff resulted in the inadequate contractual equipment specification "as well as in the weight of mud" and a consequent failure to save the well. Because of this "neglect of [plaintiff] and the violation of the contract," defendant has sustained $12,802.50 damage "as additional costs, labor and material expended" (additional to what or for what is left to the reader's imagination).

To this cross-petition plaintiff filed a general denial and a demurrer.

Now what issues did these pleadings raise? Being as generous as we can with the import of defendant's cross-petition we see but one possible theory for recovery pleaded in it, namely, that defendant executed an improvident contract because of the precontractual negligence of plaintiff in failing to procure and provide it with sufficient geological information about the area thereby causing it damage in the sum of $12,802.50 for labor and materials expended in its fruitless effort to conquer the blowout. This might be called "negligence in the inducement" of the contract. True defendant refers conclusionarily to plaintiff's "neglect . . . and the violation of the contract" but if facts are pleaded describing a breach of the agreement on the part of plaintiff we simply cannot find them.

Having identified the issue raised in defendant's cross-petition the next question is whether it is a justiciable one—that is does it involve the breach of a duty which the law recognizes as being owed by plaintiff to defendant?

■ We are not aware of any law that imposed upon plaintiff—under the circumstances of this case—a duty to obtain and provide information to defendant regarding the geology and subsurface pressure potentials of the well site in question. If no duty was owed then none there was to breach. And if no duty was breached then negligence there could not be as a matter of law.

But assuming such a duty did exist, the theory was given no attention whatsoever at trial and, as a matter of fact, the driller's proof actually disproved it by establishing its defense that the blowout resulted from an abnormal pressure the existence of which there was no way the owner or anyone else could have foreseen.[4]

Further destruction of the cross-petition theory was wrought by an acknowledge-

---

4. Driller Holt himself testified he had drilled about 500 oil wells in the area and never had seen anything like this happen before. And, at trial the contractor's attorney told the court he was not contending that there was anything insufficient about the mud weight.

ment of the drilling company president that he furnished the contract form, filled it in, and that the specification of the single-manual blowout preventer was his idea. It was admitted that the owner did not sign or even see the completed contract until the afternoon of the blowout.

The conclusion is then that the drilling company did not plead nor prove a recoverable claim against plaintiff based on tort. If the countersuit stated a cause of action it had to rest on contract—specifically paragraph 13.2 as it relates to the subject of abnormal pressures.

Consequently, since neither the pleadings nor the evidence formed the basis for finding either party guilty of common law negligence, it follows that instructions on the subject should not have been given.

Furthermore since the common law defense of unavoidable accident was not a permissible defense to a breach of contract action no instruction at all on the subject should have been given—much less the one that was.

■ We think these many errors could have been avoided if the trial judge had followed the supreme court's long-standing requirement[5] of analyzing both the pleadings and the evidence with a view toward identifying the submissible issues involved instead of reading the pleadings and telling the jury that they bespoke "the issues thus joined."

■ The trial judge did give one instruction (No. 12) relating to the contractual issues in the case,[6] though, even in it he tosses in negligence and, in effect, contributory negligence by specifying that before plaintiff can recover he must be free from fault and "use the care required." A further reference to the negligence of both parties follows along with another pronouncement regarding "unavoidable casualty" which not only contradicts an earlier one on the subject but, apparently oblivious to the contractual issues involved, incredibly tells the jury if they find the parties' damages result from an unavoidable casualty, they "should . . . allow neither party to recover against the other." This might conceivably cancel out everything else and be overlooked except that there follows one more paragraph directing the jury to find for defendant on its cross-claim if they find "abnormal pressure" was the cause of the loss—a phenomenon which ironically under the evidence was "unavoidable."

We hold Instruction No. 12 was grossly in error in requiring plaintiff to prove both a breach of contract and common law negligence on the part of defendant, as well as freedom from contributory negligence before he could recover. We fur-

---

5. Lambard-Hart Loan Co. v. Smiley, 115 Okl. 202, 242 P. 212 (1925).

6. "You are instructed that if you find from a fair preponderance of the evidence that the defendant did not perform it's [sic] part of the contract to drill said Well in a good and workmanlike manner with due diligence in the performance thereof and use the reasonable or ordinary care required to prevent damage or injury to the Well, and was negligent in performing said contract and through no fault of the plaintiff, then and in that event you should find for the plaintiff and assess the damages occasioned thereby and as submitted to you by the evidence of the plaintiff.

"On the other hand, if you do not so find and the damages sustained were caused by the plaintiff through his failure to perform his part of the contract and use the care required, you should find for the defendant.

"You are further instructed that if you find neither party failed to perform his part of the contract to drill the Well in question and is not guilty of negligence in causing the damages occasioned thereby and that same was the result of an unavoidable casualty, you should find for both defendant on plaintiff's petition and plaintiff on defendant's cross-petition and allow neither party to recover against the other.

"If, however, you find the Well blew out from an abnormal pressure, as defined in these instructions, which made the drilling abnormally difficult or hazardous without the negligence of either party and said abnormal pressure was the proximate cause of the losses complained of, then your verdict should be for the defendant on his cross-petition against the plaintiff."

ther hold the charge is ambiguous, misleading, unclear and slanted in favor of defendant. Even the last paragraph (together with the damage instruction) leaves the impression that finding an "abnormal pressure" entitles defendant to all "the losses complained of," whereas paragraph 13.2 says, for instance, that "Owner shall assume risk of loss of or damage to the hole and to Contactor's equipment in the hole . . ." and after 24 hours contractor shall operate on a "day work rate" basis.

■■ Finally the record which is certified as complete contains neither a verdict, a judgment, nor any other thing indicating that plaintiff's lawsuit has been adjudicated. The one verdict on file inferentially relates only to the cross-petition because it says simply: "We . . . find for the

Defendant and against the Plaintiff and fix the amount of Defendant's recovery at $13,152.99." [7] The Journal Entry of Judgment [8] adjudicates the cross-action but not the primary one. The effect of this is that dismissing the jury without requiring a verdict deciding the issues raised by plaintiff resulted in a mistrial.

Since plaintiff's action is still pending without any final determination and since the judgment entered below for defendant was based on a verdict resulting from fundamentally erroneous instructions, it is reversed and the cause remanded for a new trial.

NEPTUNE, P. J., and BACON, J., concur.

---

7. A separate verdict was required notwithstanding the directory implications of Instruction No. 14 which reads:
   "You are instructed that if your verdict should be for the plaintiff upon the Petition, then it must necessarily be against the defendant upon the Cross-Petition.
   "Upon the other hand, if your verdict should be for the defendant upon the Cross-Petition, it must necessarily be against the plaintiff upon the Petition."
   Such instruction is not appropriate with regard to the contractual issues involved.

8. "JOURNAL ENTRY OF JUDGMENT
   "NOW, on this 14th day of November, 1972, comes plaintiff in person and by his attorney, William B. Rogers, and also came the defendant by his attorneys, Watts, Looney, Nichols & Johnson, and this cause comes on for trial in its regular order before a jury of twelve good men and women, being duly empanelled and sworn, well and truly, to try the issues joined between plaintiff

and defendant, and a true verdict render, according to the evidence; and having heard the evidence, the charges of the Court, and the argument of counsel:
   "The jury finds the issues in favor of the defendant on his Cross Petition and fixes his damages to be $13,152.99.
   "IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the defendant have, and he is hereby given, judgment on his Cross Petition against the plaintif for the sum of $13,152.99.
   "IT IS FURTHER ORDERED THAT the plaintiff pay the costs of this action.
                          s/ Park W. Lamerton
                          DISTRICT JUDGE
   O.K.
     s/ William B. Rogers
   Attorney for Plaintiff
   O.K.
     s/ Burt Johnson
   Attorney for Defendant"