Sid Francis NAIL, By and Through his father, Don Francis NAIL, Jr., and Don Francis Nail, Jr., Sheila Nail, on their own behalf, Appellants,

v.

OKLAHOMA CHILDREN'S MEMORIAL HOSPITAL, operated by the Department of Human Services, an agency of the State of Oklahoma, Norman S. Levine, M.D., J.D. Parkhurst, M.D., James A. Glasgow, M.D., and the University of Oklahoma, Appellees.

Nos. 60678, 60091.

Supreme Court of Oklahoma.

Dec. 10, 1985.

John W. Norman, Oklahoma City, Mark Hammons, C. Elaine Hammons, Hammons & Hammons, El Reno, Ronald W. Horgan, Oklahoma City, for appellants.

George F. Short, George W. Paull, Jr., Short, Barnes, Wiggins Margo & Adler, Thomas H. Tucker, Andrew E. Thurman, Oklahoma Children's Memorial Hosp., Dept. of Human Services, Oklahoma City, Stanley M. Ward, Kurt F. Ockershauser, Susan Gail Seamans, Bd. of Regents of University of Oklahoma, Norman, for appellees.

SUMMERS, Justice.

This medical malpractice suit was brought on behalf of a small child, alleging negligence resulting in permanent brain damage. The demurrer of the defendant University of Oklahoma was sustained on the basis of sovereign immunity, resulting in appeal No. 60,091. The remaining defendants (Oklahoma Children's Memorial Hospital and three physicians) were exonerated by a defendant's verdict after ten days of jury trial. Plaintiffs have appealed from the trial court's order overruling their timely filed motion for new trial, that appeal being No. 60,678. The two appeals have been consolidated. We affirm in both.

We shall address the issues in the order presented by appellants, after a brief summary of the facts.

## FACTS

Sid Nail was born some five weeks premature, and weighed four pounds, eleven ounces. At birth he suffered from a condition making breathing extremely difficult due to his lungs having not yet been completely formed. He was cyanotic, or blue in color from lack of oxygen, during much of his first two or three weeks of life, during which period he was placed on a respirator, as he could not breathe on his own. He survived, however, and was re-

leased to his parents with the caution that he be followed as an out-patient.

In addition to his other problems Sid had been born with a cleft palate. In August of 1977, Dr. Levine decided Sid, then aged 15 months, was old enough to have surgical repair of the cleft palate, and that is the normal time when an infant starts to talk. The surgery itself was successful, but toward the end of this procedure Sid's tongue fell backwards and blocked his air passages, causing a momentary period of cyanosis (bluish coloration). This was promptly corrected and a stitch was placed in his tongue and taped to the outside of his cheek.

The following morning the stitch was removed (by Dr. Parkhurst) and the child transferred from intensive care to a room on the floor. He again began to experience respiratory distress. Dr. Glasgow was called in and removed from the mouth and throat the surgical material he believed was causing the problem. Shortly thereafter the breathing difficulty set in again and the child had a cyanotic seizure. Dr. Glasgow performed mouth to mouth resuscitation and normal breathing returned. At no time did the child lose consciousness.

This case was filed in September 1981, alleging that Sid's brain damage was caused by an accumulation of the defendant's actions: the early removal of the tongue stitch, the early removal from the intensive care unit, the failure to properly monitor the child, the failure to equip his room with proper equipment should cyanosis re-occur, the failure of the staff to obtain a physician timely, the failure of Dr. Glasgow to arrive timely, once called, and improper diagnosis by Dr. Glasgow. Plaintiffs at all times alleged and maintained that although Sid had a "stormy birth period" he was at the time of admission for the surgery in 1977 "a normal healthy but small baby" (appellant's brief p. 3). Plaintiff's testimony supported these allegations.

The defendant's testimony, contrariwise, supported their contention that Sid's disability did not and could not have occurred

during the events complained of, but totally predated the surgery, occurring either during the difficult first two or three weeks of his life, or in the first trimester of pregnancy, or by some combination of the two. No physician for either side testified that a combination of the neonatal difficulties and the post-surgical ones occurred to his detriment. All agreed that Sid remains permanently and tragically mentally retarded.

## I.

### DID THE COURT ERR IN FAILURE TO DIRECT A PLAINTIFF'S VERDICT AGAINST THE DEFENDANT HOSPITAL?

It did not. The proximate cause of the child's brain damage was strongly controverted by opposing witnesses. In passing on a motion for directed verdict the trial court must consider as true all of the evidence favorable to the party against whom the motion is directed, together with all inferences reasonably drawn therefrom.[1] Upon consideration of such motion the hospital was entitled to the benefit of every reasonable inference in its favor which could be drawn from the evidence. Evidence favorable to the hospital presented by its co-defendants is likewise to be so considered by the trial court in ruling on such motion. Where men of ordinary intelligence might differ as to whether the evidence shows the defendant's negligence to be the proximate cause of the plaintiff's injury, the question is properly one for the jury.[2]

## II.

### SHOULD THE COURT HAVE INSTRUCTED ON "AGGRAVATION OF PRE-EXISTING CONDITION?"

Plaintiff's counsel requested Instructions Oklahoma Uniform Jury Instructions Civil (OUJI–CIV) No. 4.9 which states:

"4.9 MEASURE OF DAMAGES—AGGRAVATIONS OF PRE-EXISTING CONDITIONS

A person who has a condition or disability at the time of an injury is entitled to recover damages for any aggravation of such pre-existing condition or disability directly caused by the injury. This is true even if the person's condition or disability made him more susceptible to the possibility of injury than a normally healthy person probably would have been, and even if a normally healthy person probably would not have suffered any substantial injury.

When a pre-existing condition or disability is so aggravated, the damages as to such condition or disability are limited to the additional injury caused by the aggravation."

The trial court declined the request and stated for the record:

"I don't think we have expert testimony to that effect. The only thing I believe I've heard is that one side's witness experts say it was a result of the neonatal period and the other as a result of the respiratory arrest. I don't believe I've heard any evidence of combination. (Tr. p. 1233)

A trial court must instruct on issues raised by the pleadings and supported by the evidence. The court's refusal to give requested instructions on questions neither pled nor supported by evidence is not error.[3] In fact it has been held reversible error to instruct on issues not justified by the pleadings and evidence.[4]

Plaintiffs failed to either plead or offer evidence of any pre-existing condition. In fact plaintiffs consistently maintained Sid's condition was "normal" up until his hospitalization in 1977. All of the plaintiff's

1. *Central Mutual Ins. Co. v. Dickason,* 451 P.2d 1 (Okl.1969).

2. *England v. Kilcrease,* 456 P.2d 521 (Okl.1969).

3. *Skogsberg v. First National Bank,* 439 P.2d 957, (Okl. 1968).

4. *Chase v. Paul Holt Drilling Inc.,* 538 P.2d 217, (Okl.App.1975); *Midland Valley Railroad Co. v. McKee,* 389 P.2d 492 (Okl.1964).

testimony was directed toward proving that the incident in August 1977 was the sole proximate cause of his disability. The request for instruction on aggravation came almost as an afterthought, on the morning of the day instructions were to be given.

■ Although neither party's brief offers from Oklahoma authority squarely on the subject at least two other jurisdictions have supported the trial court's refusal to instruct. The Colorado Court of Appeals in *Brooks v. Reiser*[5] said:

"[2] A second and equally valid reason for refusing this instruction was the fact that there was no evidence to support the theory of aggravation of a pre-existing condition. An instruction should not be given if the theory it propounds is unsupported by the evidence presented at trial. *Houser v. Eckhardt*, Colo., 450 P.2d 664. Otherwise, the jury might infer competent evidence is present to support this principle. *Greenwood v. Kier*, 125 Colo. 333, 243 P.2d 417.

Two medical experts testified at trial, one for the plaintiff and one for the defendant. A close scrutiny of the record fails to reveal any testimony by either doctor that the injuries suffered as a result of this accident might be related to or connected with plaintiff's back injury for which he was operated on in 1960 or 1961. Merely because the pain occurring in 1967 is in the same general area as the area operated on in 1960 or 1961 does not in itself establish the probability of aggravation. It would be mere conjecture under these circumstances to presume that the 1967 accident aggravated a condition existing by virtue of the 1960 or 1961 operation, and therefore refusal to instruct on the issue was not error. *General Motors v. Walden*, 10 Cir., 406 F.2d 606 [1969].

The Indiana Court of Appeals in *Lapsley v. Jackson*[6] said:

[6, 7] At trial Mrs. Lapsley made no claim and presented no evidence alleging

that her physical injuries and complications were in any way aggravated by reason of her pre-existing condition. In fact, Mrs. Lapsley attempted to show that her injuries were entirely unrelated to her prior physical infirmities....

[8] Mrs. Lapsley claims that Jackson introduced evidence that could give rise to an inference on aggravation; she refers to the introduction of her past medical records which showed that she suffered from numerous internal complaints prior to the accident. The mere possibility that the jury could have considered aggravation, in a case where no such theory was argued by either side, cannot require the trial court to instruct the jury on aggravation.

. . . . .

Mrs. Lapsley failed to argue that her injuries may have been aggravated by her pre-existing condition. Therefore, it was up to the jury to decide whether all or only part of Mrs. Lapsley's injuries were proximately caused by Jackson's negligence.

We hold that the trial court correctly refused Mrs. Lapsley's tender of an instruction concerning aggravation of a pre-existing condition...."

We have held that a judgment is not to be disturbed on appeal because of allegedly erroneous instructions unless it clearly appears that the instructions given or refusal either caused a miscarriage of justice or led to a different verdict than would have been rendered but for this alleged error.[7] By failure to either plead or prove aggravation of a preexisting injury we hold that under the facts of this case plaintiff was not entitled to the requested instruction, and refusal to give it was not error.

### III.

### DID COUNSEL FOR DEFENDANT PHYSICIANS COMMIT MISCONDUCT REQUIRING REVERSAL?

Appellants first complaint is that counsel caused false, misleading and prejudicial in-

5. 483 P.2d 389 (Colo.App.1971).

6. 179 Ind.App. 204, 384 N.E.2d 1136 (1979).

7. *Kimery v. Public Service Co.*, 622 P.2d 1066 (1981).

formation to be placed in the record. Dr. B, a witness called as an expert by the defendants, had examined the child and all the child's medical records. Dr. B made a report which was inserted into medical records, which report said "A C.T. Scan had been recommended done and not done." The first reference to a C.T. Scan was elicited by appellant's counsel on cross-examination. Defendants point out that Dr. B as a physician, faculty member, member of the staff of the teaching hospitals, and chairman of a department at the Health Sciences Center, upon examination of the appellant, would have been remiss not to have placed a copy of his report of examination in the patient records of the institution. This report was not a surprise to appellants. It was furnished prior to the trial and was in the hands of appellants' expert witnesses.

The trial court, acting within its discretion, refused to allow appellant to summon co-counsel to the witness stand to refute evidence elicited as to the requested CT scan. The trial court looked at this issue carefully and then admonished the jury to disregard the issue of the requested CT scan as it was of absolutely no relevance in their decision.

■ Appellants secured an affidavit from a juror concerning what the jurors had based their decision upon. With respect to juror affidavits this Court has determined:

"Public policy does not allow jurors to be heard by affidavit or otherwise as to how or what factors were considered in rendering a verdict unless there be actionable or criminal overtones present." *Holden v. Coussens*, 576 P.2d 758, 761 (Okl.1978).

The conduct of a trial is a matter of the sound discretion of the trial court, and in absence of abuse of that discretion, the trial court's ruling will not be disturbed.[8]

■ Appellants further complained of repeated verbal personal attacks by opposing counsel during trial and in closing argu-

ment. Such examples of misconduct however, if they occurred, were not targeted by objections and they are not subject to review by ourselves. We have on numerous occasions held:

"Alleged prejudicial remarks of counsel in his argument to the jury are not preserved for review by this court unless objected to ... at the time the remarks are made...."[9]

The trial court considered all allegations of improper conduct at the hearing on motion for new trial. We find no error in his refusal to grant a new trial on these grounds.

## IV.

### DID THE TRIAL COURT ERR IN ALLOWING DEFENDANTS TO CALL AN EXPERT WITNESS OUT OF TIME?

This trial started on a Monday. At 2:20 P.M. on the following Friday the defendants approached the trial judge with a request to call a defense witness out of time. The witness was Dr. R, a cleft palate specialist from Philadelphia, who had been scheduled for Friday afternoon by defendants' counsel. Defendants' counsel had projected that plaintiffs would have rested by then. In fact plaintiffs had not rested, and still had one more deposition to read to the jury. Plaintiffs' counsel objected to the interruption, and subpoenaed the doctor himself for the following Monday morning. Defendant represented to the court that the doctor, essential to their case, could only be available for testimony that afternoon, and then had to return to the east coast. The Court allowed the witness to be called out of time, with appropriate explanation to the jury. Although not waiving his objection, plaintiffs' counsel said:

Mr. Norman: "We want to request as much time for cross as used in the direct."

The Court: "I'm not allotting any amount of time. You use it at your own discretion." (Tr. P. 692)

8. See *England v. Kilcrease,* supra note 2.

9. *Bateman v. Glenn,* 459 P.2d 854 (Okl.1969).

At the conclusion of direct, cross, redirect, recross, and more recross examination, the court said:

The Court: "Are you finished with the witness?

Mr. Norman: "Yes, I'm finished." (Tr. P. 762)

We have held that the order in which proof is introduced at trial rests very much within the discretion of the trial court, and unless it clearly appears that this discretion has been abused to the injury of the complaining party, a judgment will not be reversed on this ground.[10]

 Plaintiff claims prejudice by not being able to cross-examine Dr. R. *after* he had placed in evidence the final deposition, but he fails to demonstrate how he was so prejudiced. Plaintiff's counsel requested equal time for cross-examination. The record indicates direct and redirect consumed 24 pages of transcript, while cross and recross took 45. Trial judge noted the cross-exam was "very exhaustive". (Tr. 764) The court did not cut off cross-examination, but rather counsel said "Yes, I'm finished." We find no prejudice to have resulted in either allowing the witness to testify out of time or in failing to order the doctor to return for further cross-examination Monday morning.[11]

## V.

WAS THERE PREJUDICIAL ERROR IN THE TRIAL COURT RULINGS ADMITTING CERTAIN EVIDENCE AND EXCLUDING CERTAIN OTHER EVIDENCE?

 Plaintiffs object to the admission of xerox copies of some of plaintiff's hospital records as not the best evidence. Plaintiff had previously at pretrial waived identification of "medical records." The "best evidence" objection now interposed was not suggested when the exhibits were offered, and may not at this stage be successfully invoked.[12]

Plaintiff objects to admission of the "curriculum vitae", or resume of qualifications of two expert witnesses for the defendants. These may have been admitted in error as either cumulative or contrary to 12 O.S. § 2803(5),[13] but no prejudice is shown to have resulted.

"A. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of a party is affected...." [14]

Error is claimed in the court's refusal to admit certain summaries of medical records, prepared in poster form. Summaries of the evidence are treated in the code at 12 O.S. 1981 § 3006:

"The contents of voluminous writings, recordings or photographs which cannot conveniently be examined in court *may be* presented in the form of a chart, summary or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place. The judge may order that they be produced in court." (Emphasis supplied.)

 Whether to admit such summaries pursuant to the "may be" language of the statute is discretionary with the trial court. No abuse is shown.

The same principle controls plaintiffs' complaint for failure to admit photos offered to show the hallway looking from the nursing station.

The final assignment of evidentiary error arises out of cross-examination of Dr. R. Plaintiffs' counsel vigorously interrogated

**10.** *Stanfield v. Lincoln,* 150 Okl. 289, 1 P.2d 387 (1931).

**11.** See *Frierson v. Hines,* 426 P.2d 362 (Okl. 1967).

**12.** 12 O.S.1981 § 2104(A)(1).

**13.** "A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly. The memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party;"

**14.** 12 O.S.1981 § 2104(A).

the witness regarding a chapter from an authoritative text entitled *Reconstructive Plastic Surgery*, Ch. 50 in particular. At issue was whether certain statements in the chapter pertained to only newborn infants as the doctor maintained on the stand, or to other patients such as Sid. Plaintiffs offered the treatise as an exhibit and defendants' objection to it was sustained.

Insofar as the treatise was offered as "reliable authority ... called to the attention of an expert witness upon cross-examination", the objection was correctly sustained. Such "statements may be read into evidence but may not be received as exhibits." [15] The more serious problem is this: Chapter 50 of the book was actually written by the witness, and the offer was therefore that of a prior inconsistent statement. The court thus erred in sustaining the objection.

We find, however, nothing so inherently prejudicial in this error as to require reversal. The exhibit was offered to impeach the witness' credibility, and the witness had already been cross-examined thoroughly with questions and quotes from the treatise. Thus the jury had already been exposed to the excluded information. Further, Dr. R's testimony as to the ultimate issue in the case, causation, was that of but one of four non-party physicians, each of whom testified that the injuries pre-dated the surgery. We have held that the test of errors not inherently prejudicial is the likelihood that the verdict would have been different had they not occurred.[16] Upon a careful review of the evidence we cannot conclude that this error requires reversal of this complicated trial of ten days duration.

## VI.

### DID THE TRIAL COURT PREJUDICIALLY INTERFERE WITH PLAINTIFF'S VOIR DIRE EXAMINATION?

Appellant complains that during his interrogation of a prospective juror it developed that the prospective juror's company had a service contract to deliver water to the defendant hospital. Whereupon the court made further inquiry, and later held that the juror did not meet any of the grounds for challenge for cause. The juror was excused by the plaintiff peremptorily. The voir dire was not reported but the following record was made out of the jury's presence at the close of plaintiffs opening statement (Tr. 36, 37, 38)

> "Mr. Norman: "... The Court thereupon took over the examination and asked the prospective juror Arnold for on the other hand he felt the evidence will justify a verdict in favor of the hospital, would he return a verdict, and the prospective juror said yes and plaintiffs' counsel was instructed to move on to another subject."

> The Court: "I think your question to him ... not your question ... my question to him was notwithstanding the fact that you might find it difficult, would you judge this evidence fairly and impartially and then your verdict you felt justified under it, and he said yes. It's correct. I did not permit him to be excused for cause because I'm of the opinion that not only are jurors eligible to remain with such an answer, but oftentimes make the better juror where they operate in spite of difficulty; that when they make a wiser and sounder verdict when they operate under such circumstances."

Appellant claims that but for the court's questioning, the juror would have wound up disqualified for cause, and would not have required appellant to use a peremptory challenge that he needed for another juror. Pursuant to Rule 6, Rules for the District Court, 12 O.S. Ch. 2, App. the trial judge

> "may outline the nature of the case, the issues of fact and law to be tried, and may then put to the jurors any questions

---

**15.** 12 O.S.1981 § 2803(18).

**16.** *Karriman v. Orthopedic Clinic,* 516 P.2d 534 (Okl.1973).

regarding their qualifications to serve as jurors in the cause of the trial."

We have said in *McAlester Urban Renewal Authority v. Lorince:* [17]

"A large discretion is vested in the trial court in determining the competency and qualifications of jurors and its action should not be disturbed unless an abuse of such discretion is clearly apparent."

We find no such abuse of discretion in the court's asking if the juror could be fair and impartial, and upon receiving an affirmative reply, refusing to challenge for cause.

### VI.

WAS THE DEMURRER OF THE BOARD OF REGENTS FOR THE UNIVERSITY OF OKLAHOMA PROPERLY SUSTAINED BY REASON OF SOVEREIGN IMMUNITY?

The petition named the University of Oklahoma as the employer of the three physician defendants under the doctrine of respondeat superior. Demurrer was sustained on the theory that the University in employing the individual doctors was performing a governmental, not proprietary, function. Since by this opinion we affirm the judgment of the District Court that no liability attaches to the servants we need not address the question of liability of the master. It is moot.

Judgment of the District Court of Oklahoma County in favor of all defendants is affirmed.

SIMMS, C.J., DOOLIN, V.C.J., and HODGES, HARGRAVE and OPALA, JJ., concur.

KAUGER, J., concurs in result.

ALMA WILSON, J., concurs in part, dissents in part.

LAVENDER, J., disqualified.

17. 519 P.2d 1346, 1348 (Okl.1974); see also *Rogers v. Citizens Nat'l Bank,* 373 P.2d 256 (Okl. 1962).